**EXHIBIT A**
*SEALED*

**(attached)**

## DECLARATION OF ▮▮▮▮

I, ▮▮▮▮, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is ▮▮▮▮. I was born on ▮▮▮▮ in ▮▮▮▮. I am 34 years old and a native and citizen of ▮▮▮▮. For the last four years I have lived in ▮▮▮▮.

2. I married ▮▮▮▮ in 2006. We have been separated since 2015, though we are still legally married.

3. Together ▮▮▮▮ and I have two children, ▮▮▮▮, who is ▮▮ years old, and ▮▮▮▮, who is ▮▮ years old.

4. Since 2015, ▮▮▮▮ and ▮▮▮▮ have lived with ▮▮ in ▮▮▮▮. ▮▮ has been their sole caretaker for almost four years. Over that time-period, ▮▮ and I have been in daily communication regarding the children.

5. Beginning on or around August 2018 ▮▮ began receiving threats from gang members threatening his life and the life of my children.

6. After the threats persisted, ▮▮ decided to bring our children to the United States to apply for asylum.

7. ▮▮ and I agreed that he would bring the children with him to ▮▮, and I would be here to receive them and help him get on his feet. He would start working and find a place to live with the children. This was always the plan.

8. When he arrive at the border with the children in October, 2018, he was falsely accused by U.S. border agents of being a gang member. The agents took ▮▮ and ▮▮

away from him and put my children in a children's shelter located in San Antonio, TX within two days.

9. I was contacted by the children's shelter within a few weeks when they let me know my children were detained.

10. After that initial contact, the children's advisor at the children's shelter, Alexander, set up bi-weekly calls between my children and myself.

11. After a month of this, the children began asking to speak to their father. They had not spoken with him since being separated at the border.

12. Alexander was able to arrange for a weekly call between my children and ▮. Both ▮ and ▮ were very happy to hear from their father. They love him very much.

13. Almost immediately after making contact, Alexander began the process to have the children released. This process took months. I was required to have my fingerprints taken, and to complete and submit several forms. I think there was also a delay due to the government shutting down for over a month.

14. Both ▮ and ▮ were desperate to leave the children's shelter. They were alone, in a new place, and had been separated from their father suddenly and without warning.

15. They are children, and they naturally wanted to be at home, with their parents.

16. I think Alexander or someone else at the children's shelter was telling the children that if I only submitted these forms, or had my fingerprints taken, that they could be released.

17. Whenever I spoke to my children, they were asking me if I had submitted the forms or done whatever else the people at the children's shelter had asked.

18. My children were very anxious to be released, and it was difficult to explain to them what was happening with their father without worrying them more.

2

19. Throughout all of this, I told Alexander several times that I wanted the children re-united with their father. Anyone I spoke to at the shelter told me that ▮ case was not their concern. Their only job was to have the children released and removed from the system.

20. I was very worried about ▮. I even hired an attorney for him when I first found out he was detained.

21. ▮ is a good father. He has cared for our children for the last four years in ▮ and did all that he could to keep them from harm. He brought our children to the United States to protect them from the threats he was receiving in ▮.

22. I was also in contact with ▮ attorneys, who told me that they were preparing an appeal for ▮ so that he could be re-united with our children.

23. About a month ago, in mid-January, 2019, Alexander told me that ▮ was being prepared to be deported and so family re-unification between him and my children was no longer possible.

24. Alexander asked me to have ▮ sign a paper that would release his rights to our children, and give custody to me.

25. I told Alexander that I would not do that. I still hoped that family re-unification between my children and their father was possible because ▮ lawyers were preparing an appeal on his behalf.

26. I heard nothing from the children's shelter after the last phone call in mid-January when Alexander told me that ▮ was to be deported.

27. Suddenly, last Monday, February 4, I received a call from the children's shelter at 7am in the morning telling me that my children would be released to my custody the next day, on Tuesday.

28. I told them that ▮ lawyers were appealing his case and that my children were going to be re-united with their father when he was released.

29. The person from the children's shelter told me that ▮ was being deported and that family re-unification was no longer possible. They told me that someone would be calling me to ask for my credit card number to pay for airplane tickets for my children and the chaperone that would accompany them on the plane.

30. Everything happened so quickly. I was not asked, but told, that my children would arrive at the ▮ airport the next morning and I was to be there to receive them.

31. Within an hour, someone else from the children's shelter called me to take my credit card number. I paid two thousand, one hundred dollars for the three plane tickets for the next day.

32. On Tuesday, February 5, I went to the airport in ▮ to pick up ▮ and ▮ at 11am.

33. I was so happy to see my children, and they were thrilled to be released from the shelter. But this was not supposed to happen like this..

34. I am happy that my children are safe, and no longer being detained but I am very sad that I have not been able to do more to help ▮.

35. What I wanted was for my children to be re-united with their father. This was always the plan.

36. A week after ▮ and ▮ arrived at the airport in ▮, I was called by someone else from the children's shelter. They called me at 7am in the morning to tell me that the government had deported ▮ and that he had signed a form saying that the children were to be deported with him.

4

37. Now that the children were in my custody they wanted to know if I wanted to children to stay with me or for them to go back with their father.

38. Since I had been in contact with ▮ lawyers and my childrens' lawyers, I knew that ▮ judge had issued an order which prevented him from being deported. I also knew that ▮ had not signed any papers.

39. I told the people from the children's shelter that they are playing with my children, and my family; none of this is fair. I told the people who called me that they were trying to make me throw ▮ under the bus and that I wouldn't do that.

40. I continue to believe that ▮ lawyers will win their appeal and have him released to be re-united with ▮ and ▮.

41. Since my children were detained I have felt tremendous pressure because of how the shelter has handled this situation. Throughout all of this they have not taken into consideration that my children want to be with their father. It is as if their needs have been completely ignored.

42. My daughter is old enough to understand what is going on. She heard the border patrol agents tell ▮ that he is a gang member and she knows that is not true.

43. She understands what is going on now and she is scared and depressed. I think my daughter will need help from a therapist to work through all of this.

44. Both of my children want to see their father, desperately.

45. I love my children, and I will continue to do whatever I can to support them. But ▮ and ▮ came to this country with their father, ▮. They should be re-united with him.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on February 15, 2019.



I hereby certify that I orally translated the foregoing declaration into Spanish and read it to the affiant who indicated that he understood it and agreed with its contents. I further certify that I am competent in both English and Spanish to render and certify such translation.

Carmen M. Ayala

Carmen Ayala